Good afternoon, Your Honors. My name is Timothy Lord. I represent America Cargo Transport, the appellant in this case. This case arises out of a dispute related to two statutes, both of which have to do with shipping. The first one is a series of statutes which allows the government to procure food aid and arrange for the shipping of it around the world to implement the United States social and humanitarian policies of feeding children. The Department of the United States for Agency International Development is charged with the FISC on that program. It also, this case involves another statute called the Cargo Preference Act. The Cargo Preference Act is an act that provides authority for the Maritime Administration under the Department of Transportation to ensure that the U.S. flag fleet remains alive and capable of assisting in emergencies. It can be summed up as a subsidy program. And so what happened here is American Cargo Transport wanted to haul some cargo to India. The process of doing that is by going on the Internet and submitting a bid. The USAID makes these bids possible along with other alphabet soup agencies, Commodity Credit Corporation and the Department of Agriculture. The bottom line is if you want to ship the cargo, you submit a bid. Well, the Cargo Preference Act says that where food aid cargo is involved, 75% of that cargo will be shipped on U.S. flag carriers. What that means as a practical matter is that it will be more expensive because U.S. flag ships are more costly with the safety requirements, the crew requirements, etc. That's a known fact and there's no magic to it. Congress has stated through the Cargo Preference Act that that's a means by which the government will support the existence of the U.S. flag fleet. American Cargo Transport about five or six years ago submitted a bid to carry cargo to India. There are numerous regulations that govern the bidding process, one of which is a merit regulation 381.5, I believe it's 46 CFR 381.5, requires and mandates that where a ship owner submits a bid and it's a full ship load, it doesn't define what a full ship load is, but the industry knows what that is. And there's no dispute that American Cargo Transport submitted a full ship load bid. The regulation requires that where that happens, the receiver of the bid, USAID, will concur with the maritime administration. Let me ask you about that. Postulate is caged as such that apparently you had not only a point, but you had a good point, because the government ultimately ended up agreeing on that, correct? I wish it was that easy. Okay. So I thought that in effect that the government adopted that interpretation with respect to the consultation and concurrence. Well, it's not for them to adopt it. It's a regulation that they have to comply with. Well, no, wait, you know, that's why we have courts, because sometimes we have all kinds of laws and regulations that people disagree over what they mean, and the last two cases are good examples. So here's a third one. But now they've said, well, it means what you say it means. No, they didn't. Okay. And why is that not the case? Well, the statute says where there's a foreign flag bid and a U.S. flag bid that before USAID gives the foreign flag carrier the cargo, which they like to do because it's cheaper, they have to talk to MERAD, and MERAD's sole purpose in life is to support U.S. flag shipping, so basically there's going to be a down vote, and so the U.S. ship is going to get the cargo. In this case, the competing bid that ended up getting the award was not a U.S. It was a foreign flag vessel. So that shipment is over. It's done. It's gone. It's happened, correct? Yes. Doesn't that, in some respect, moot your claim for injunctive relief? We can't enjoin something that's already happened, right? No, but you can issue declaratory relief. Okay. And the declaratory relief you seek would be what? To declare that the ‑‑ In the future, fill in the blank. What? Well, we'll start with ‑‑ I think I can segue in. I didn't quite finish the answer to that. Why don't you finish the answer and then go on. Okay. So what you have is exactly what the statute says, foreign flag, U.S. flag, concur. The government came in and the court said that we have a new policy, and the new policy is where there's a U.S. flag bid and a competing U.S. flag bid, then we'll take the full ship load. Well, the evidence was that it was not a U.S. flag versus U.S. flag bid. It was a foreign versus U.S. That's what the statute says. You don't need a new policy. All you need to do is read the rule, look at the facts, and say, okay, so this is ‑‑ I don't say this lightly, but the government must understand, and they don't mention it in their briefs, they don't talk about it. I talk about it all throughout my briefs, and I think they'll admit that that's the facts. So if that's the facts, then the regulation, 3A1.5, should have been followed. There should have been no two‑year discussion about what a new policy was. But it's gone. I mean, the ship load is gone. So what is the declaration that you would ask the court to enter under your declaratory judgment relief? We would ask that the court acknowledge the fact that this was a violation of the statute, the new policy is fine as it is, but it's not a result of the facts of this case. We also ‑‑ Well, so where would that get you? I mean, the fact is that that shipment is gone. The policy that they now have in place is the policy of how you read the statute, correct? It's incorrect reading of it. That's not the facts of this case. The facts of this case is not the ‑‑ You know, I don't think you're hearing us. Okay. Your shipment is gone. Yes, it is. Okay, you might have another one down the road. Okay. The declaratory judgment you want is to read the statute when you have a foreign flag and a U.S. flag carrier that consultation is required? Is that what you want? Yes, declaratory judgment. That was the facts of this case and therefore it won't. Let me say it again. Tell me if that's what you want. If you don't, that's fine. I'm just trying to ‑‑ You know, at the end of the day, we have to write a decision. We're not going to write a decision that says, well, the facts of this case, and they changed, and then the government did this, and they did that. We're going to write a decision which is going to say either declaratory judgment is moot, declaratory judgment is not moot, you win because of X, declaratory judgment is X. So I'm saying is what you want from declaratory judgment that when there's a foreign flag carrier and a U.S. carrier that consultation with NARAD is required? That's to the extent that the government's claim that the reading of the statute ‑‑ Yes or no, is that what you want? Yes. Okay. Now what else do you want? I want declaratory judgment that the 75% requirement must be met on an annual basis. Let me ask you a little different question. Your position basically ‑‑ Before you do that, you want anything else in your declaratory judgment? That the lowest line of cost shall be determined on the basis of U.S. flag bids. Okay. It's your position basically that MRSC is not a U.S. flag vessel under the Administrative Procedures Act. There has to be evidence of that in the administrative record. Quite frankly, I couldn't find it. No, there isn't, and that's what I want to get to. This is a case of admiralty jurisdiction. This is not a ‑‑ the basis for subject matter jurisdiction in this case is admiralty. And my case I rely on for that mainly is Norfolk Southern v. Kirby. That case says that the basis to determine admiralty jurisdiction is conceptual, not spatial. Prior to Kirby, there was a series of cases in the appellate court and the lower courts that looked at geographic voyages and the number of miles, et cetera. The Supreme Court abandoned that analysis in favor of a conceptual approach. And it was so conceptual it found that a railroad accident in Alabama was connected to maritime commerce, and therefore the basis of the admiralty grant was to protect maritime commerce. So a series of contracts, despite the fact there was no privity between the first contracting party and the last, nonetheless didn't preclude the application of admiralty jurisdiction. What the judge relied on in the government's argument is that the preliminary contract doctrine and the applied contract doctrine work together to make this case not admiralty. The preliminary contract doctrine has eroded beginning with Central Gulf Lines. Although there's been no decision that it's no longer valid, I would say Kirby abrogates the preliminary contract doctrine, which the government relies on to say, well, there's no contract here. It was a solicitation for a contract. Well, the preliminary contract doctrine looks at contracts that arguably are not maritime, that precede one that is. So if you use that doctrine, I believe that it is inconsistent with Kirby. And, in fact, in this case what happened is the government admittedly, after the fact, and even though it's not in the administrative record, it is in the deposition testimony that the government voluntarily provided, that had they known that the maritime ship was not a U.S. flagship, they never would have given that bid to them. That's in the deposition testimony they took. And, again, it's not in the Administrative Procedure Act record. And so that basically, by eliminating the basis for admiralty jurisdiction and relying on the APA record, you're not going to get to that testimony. Could I back up just a little on the admiralty question? Under the Suits and Admiralty Act, one of the requirements would be that you'd be able to, for the waiver of sovereign immunity, that you'd be able to bring that suit in a private capacity. But what we're really talking about, as you pointed out at the beginning of your argument, is basically preferential treatment based on policy that the government has. How would a private person, how would that be analog to a private party suit? Well, the government's position, I believe, is that, well, they state that the cargo preference laws apply in their briefs, and so no private party could ever be tasked with enforcing the cargo preference laws. And then they say, however, given that this contract is actually signed between private organizations, relief organizations, and the ocean carrier, and they have some capacity to go outside that, they can choose under their regulations to forego the recommendation of the government and choose another contractor. And the government in the briefs say, if they would do that, they have the right to do that, but if they would do that, then we would come in and stop them from doing that. So they imply that this type of, that their oversight and their decision-making process can be made by the private relief organizations by rejecting their recommendation. So in essence, they're left to their own devices to enforce the Cargo Preference Act. And in fact, Congress subsequently, subsequent to this case and perhaps partially because of it, passed a law that says that any private individual or anyone who violates the Cargo Preference Act can be fined $25,000. There are other programs that apply the Cargo Preference Act, such as the XM Bank Financing Program, where it's completely up to the contractor to comply with the Cargo Preference Act. Well, but the whole structure of the Cargo Preference Act is one in which it's the government as an essential party, correct? For Food Aid, Cargo, USAID, and MARAD. All of which are government agencies. Yes. But what I'm telling you is in their briefs, they admit that the private relief organizations can ignore their recommendation as to the contractor and choose their own. That doesn't make them, that doesn't allow them to violate the 75% by country standard. Your time has expired. I'll give you a little time for rebuttal. We'll hear from the government. Thank you, Your Honor, and it may have pleased the court. My name is Tom Woods and I represent the United States in this case. ACT's claim in its entirety for prospective relief is moot. And as the district court correctly held, there's no waiver of sovereign immunity permitting ACT's claim for monetary relief. For their claim for prospective relief, the ship literally sailed in this case. The contracts were completed years ago. I knew someone couldn't resist saying that. I couldn't, Your Honor. I've been saving that all week. But the bidding process was completed years ago, and as we cited on page 21 of our brief, a challenge to a bidding process where the contracts have been completed presents a moot question. Now the question then is, are there exceptions to the mootness doctrine that would somehow save ACT's claim? And as the district court found, at least with respect to 381.5, that's not the case. And let's start with this dispute as to whether Marisk submitted a U.S. flag bid or foreign flag bid, something that ACT has made much about. Page 55 of the administrative record, Marisk specifically represented to the United States that they were offering a U.S. flagged vessel. The agency is entitled to rely on that representation. If ACT has a beef with that, it's a beef with Marisk. It's not a beef with the agency. Now, ACT has submitted material outside the scope of the administrative record, some of which, in fact, was not even presented to the district court. I'm loathe to rely on that material for that reason. However, I do think it actually clears up this point quite clearly and shows the lengths to which the agency went to to ensure that Marisk was, in fact, offering a U.S. flagged vessel. So in the deposition testimony of Denise Sherrill, who works at AID, and that's at 521, 522, 526, 539, 540 of the administrative record, the chronology is as follows. When the offer came in, AID actually called Marisk to verify that they were offering a U.S. flagged vessel. When it became known that this vessel through the Maritime Administration was being re-flagged, they called again, and Marisk offered a different vessel. It then turned out that the charities, after the awards had already been made, had decided to reallocate a portion of the cargo to different places in India. And at that point, AID did its best to ensure that the portion of cargo that, in fact, could go on a U.S. flagged vessel, given the change of courts in India, did, in fact, go. I mean, that's a story that shows the lengths to which the agency is ensuring that a U.S. flagged vessel is being used. Now, more broadly, ACT does not face a reasonable expectation that this challenge conduct is going to reoccur because there's been a change in policy. I mean, this case presented an extraordinary case in which you had two agencies who disagreed as to how a regulation, and frankly, a regulation that was not entirely clear, as to how it applied. And through the resolution process, the government now agrees, as we've set forth in our papers, that ACT's interpretation of the regulation, we've got these competing bids by U.S. flagged vessels, that that's a circumstance in which the agency should give preference to the full shipload offer, absent concurrence from the Maritime Administration. And the Ninth Circuit has held in wide feely that when the government comes forward and says that there's been a new policy or this is the interpretation of the regulation on an ongoing basis, that moots a claim for prospective relief. Now, Your Honor, ACT also says, well, this is a case in which our claim for monetary relief is still live because of the Suits and Appellate Act. But in fact, there are multiple reasons why that waiver of sovereign immunity does not apply in this case, any which one of which dooms their claim. And so the first is that the waiver extends only in circumstances in which a private party would be liable for the same type of conduct. And we see that in the FTCA arena. It's a similar requirement. And if I could sort of posit the two poles of that spectrum, it's the cases that do fall within and cases that fall without. The green case that we cited in our briefs, a district court decision in California involving a claim in which the plaintiff said that the government violated the Fourth Amendment, that there was an unlawful search or seizure of the vessel, that somehow that fell within the waiver and that the district court correctly held that that's a requirement that's uniquely imposed on the government. So that would not fall within the waiver. And then you have a case where, say, you have just a naval vessel or a government vessel, and there's a claim of negligence, equivalent of a car accident on the sea. That's a case that is going to fall within the waiver because it doesn't make a difference whether it's a government vessel or a private vessel. That type of conduct is going to be applicable regardless of who is driving or sailing the ship, if you will. And here the requirements, the unique requirements in this case, are not ones that a private party could be liable for. They're uniquely applicable to how the government evaluates bids. This is not something that ACT could haul a private party into court and sue upon. But it's uniquely applicable to the government. So for that sole reason, that reason alone, there's no waiver of sovereign immunity permitting their claims in this case. But there are other reasons, too, that are independent. So ACT's claim in this case is one for unjust enrichment. In the Arkowski case, I'm sure I'm mispronouncing it, but the case that we've cited in our briefs from the Supreme Court, presented the question of when a claim for unjust enrichment is cognizable in Appleton. And what the Supreme Court said in that case, because there was a dispute as to whether it's cognizable at all. And what the court said, the language of the decision, is that the claim has to arise out of a maritime contract. That's what the court said. And here, ACT's claim doesn't arise out of a contract. In fact, it's all preceding to a contract. It's to the evaluation of the bids, conduct that's preceding a contract. So for that second reason, that second independent reason, under the Supreme Court's wording in the Arkowski case, there is no waiver of sovereign immunity. The third reason is that you've got the preliminary contract doctrine. So that doctrine holds that generally conduct that's preceding the entering into a maritime contract is not a maritime contract that's cognizable in Appleton. And the Exxon decision, the government acknowledges, talked about whether that doctrine, or reserved the question, if you will, whether that doctrine still survives and is good. But what the cases following Exxon have said is that when you have a dispute, the characterization of which, the duties of which involve conduct that's not particular to a maritime dispute, but rather that's conduct that's more generally applicable, that that's not something that sounds in admiralty. And here, to the extent ACT has a claim, because again, there's no contract between ACT and the government. And in fact, as ACT, as the cases acknowledge, generally challenges in the bidding process is not something that's cognizable in admiralty. So they're forced to rely upon the legal fiction, what the Ninth Circuit has said and other courts have said, the legal fiction, that somehow the government has a duty to evaluate bids in good faith. But that's conduct that's not particular to a maritime dispute. And again, that's conduct that's preceding the entering into of a maritime contract. We have also the issues about, ACT says, that their claims relating to the 75 percent standard and the lowest landed cost somehow are a live and then have merit. And we start with the fact that those claims are moot. And they're moot because the exceptions to the mootness doctrine talk about if this same sort of controversy were to arise again. Now, it doesn't have to be precisely the same set of facts, but generally the same sort of controversy. If it were to arise again, if there's a reasonable expectation they would be subject to harm, then perhaps it's moot if you can otherwise meet the exceptions to the mootness doctrine. Well, here we're all in agreement. ACT, the government, we're all in agreement that if this sort of bid were to arise again, what the agency would focus on is 381.5, given the resolution between the government. I think what he's saying is, well, you know, you say that now, but if we got into this situation with the 75 percent and the lowest cost in the U.S. flag, that you, the government, are not necessarily in accord with the positions they've taken. And I respectfully, there's no doubt that in a future case, there's no doubt, that there could very well be a dispute between the government and ACT as to how the lowest landed cost or the 75 percent standard applies. I acknowledge that. But here's the point, Your Honor, that because we're talking about, we're not talking about a dispute in a vacuum, one that might happen somewhere in the future. What we're talking about is an exception to the mootness doctrine, which says, basically, that if this same sort of conduct were to reoccur, would they be subject to the same harm again? And if this same sort of conduct were to reoccur, you don't get the lowest landed cost. You don't get to the 75 percent. Those are not issues that are in dispute between the parties with this particular type of dispute. Instead, 381.5, that's the threshold determination. And the consultation referral is the... It's the threshold determination. That's what's going to dictate this result. And so those issues are moot. Now, if the court were to reach the merits of those claims, which we submit would be inappropriate because it's moot, the claims, as Judge Robart found, are without merit. And starting with lowest landed cost, one thing, as we've noted in our briefs, the regime for lowest landed cost has changed since the time of the bidding. But going back to how it was at the time of the bidding, it was a two-step process. So what the agency would do is they would first deal with where are we going to purchase the commodities and where are we going to ship from. And that's where the lowest landed cost factored into, which was should we purchase the wheat or the vegetable oil from a particular Midwestern state, somewhere out west, somewhere out east, and where it would be shipped from. And the lowest landed cost dealt with that scenario. In short, what the agency would try to do is to find the combination that would result in the lowest cost of the commodities plus a court considering the cargo preference requirements. That was step one of the process. Step two was once that process was complete, once you figured out where the commodities would be purchased from and where the goods would be shipped out of, then you have what was this dispute, which is who's going to carry, who's going to ship the goods. That's what this dispute was, part two of that analysis. So here, ACT is not challenging the first step of the process. They're not challenging the fact that we bought the vegetable oil from a particular source or a particular state. They're not challenging the selection of the port in Texas where the stuff was shipped from. What they're challenging is the second step of the process, which is they felt they should have gotten the bids. And that is not something that lowest landed cost factored into during the process as it existed at the time of their bids. Second point is the 75%. Once again, it's moot, but to the extent the court was to reach the question, as Judge Robart found, that claim is without merit because there's simply no requirement that the agency hit a particular threshold at a particular point in time in the cargo preference year. Here we had a situation in which there were about seven months left in the cargo preference year. So for that reason, the claim is without merit. Are there any, the green case, of course, is maybe at the far extreme because it relates to the Fourth Amendment and searches. Are there any other cases where courts other than a district court has said this is the type of claim that falls outside the Act? Not in the Suits and Amnesty Act. I think the Federal Tort Claims Act. And there's thousands of those, of course, on both sides. We've searched far and wide. I just wanted to ask if, see if you'd turned up anything we hadn't. Yeah, we searched far and wide and we do think, but we think that the Federal Tort Claims Act cases really are analogous. I mean, it's, it should, it is the analogous situation, which is you've got the question of, is there a waiver that permits the plaintiff to come into court? And I would argue that the two regimes, whether you're talking about Amnesty and the Suits of Amnesty Act or just a pure tort claim or the Federal Tort Claims Act, it's the same type of question, which is we want, not we want. What Congress has said is that to come into court and to get damages from the government, you've got to present a situation which basically the government, if they were a private party, would be liable. So we. Thank you. Thank you, Your Honor. I seem out of time. You've used up all your time. I'm going to give you a minute for rebuttal if you've got a couple points and can keep it to a minute. There's your time. Your Honor, the Ninth Circuit is faced with the Kirby decision, the preliminary contract doctrine, and all of the baggage that goes with it. It's time to acknowledge that that doctrine is unworkable. The Supreme Court hasn't gotten there. No appellate court has gotten there. This Court should acknowledge that and that this is actually fairly described as a dispute on the formation of a maritime contract for the international transportation of goods, but for the government's violation of the law, that contract would have been awarded. And so, in effect, finding any other way would allow the government to control subject matter jurisdiction by either granting a contract and therefore its admiralty or, like in this case, violating the law and denying it and saying there's no admiralty jurisdiction. Thank you. Thank both counsel for your argument this morning. American Cargo v. United States is submitted.
judges: Whelan, Hawkins, McKeown